AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:20-MJ-170 |
| 1536 SE. 7th St. Amarillo, TX 79107 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
1536 SE 7th St Amarillo, TX 79107

located in the _____ Northern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C) | Distribution and Possession with Intent to Distribute Methamphetamine |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeremy Hoffman, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:    11/3/2020

_____
*Judge's signature*

City and state: Amarillo, Texas

Lee Ann Reno, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Jeremy Hoffman, a Task Force Officer with the Drug Enforcement Administration, do depose and say:

**Affiant's Qualifications**

1.      The Affiant has been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) since December 2015.   Affiant has received basic and advanced training from the Amarillo Police Department, Texas Department of Public Safety (DPS), Midwest Counter Drug Training Center, Texas Narcotics Officers Association and several other organizations and Drug Enforcement Administration. Affiant is currently assigned as a Task Force Officer (TFO) with the DEA's Amarillo High Intensity Drug Trafficking Area (HIDTA) Group.   Affiant's duties include, but are not limited to, investigating drug trafficking organizations responsible for the money laundering, smuggling, distribution, and transportation of quantities of illegal controlled substances into and across the United States. Concurrent with an assignment to the Amarillo DEA Task Force, Affiant is employed as a deputy sheriff with the Randall County Sheriff's Office and has been so employed for the past 19 years.   For the last four years at the Randall County Sheriff's Office, Affiant has been assigned to the Special Operations Unit.   Affiant has personally initiated and conducted numerous narcotics investigations, including multiple-defendant organized crime cases. Affiant has been the affiant and has participated in the execution of countless search and arrest warrants.

1

## Source of Affiant's Information

2.      I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.  my experience investigating the distribution of illegal controlled substances and the laundering of drug proceeds;

b.  oral and written reports, and documents about this investigation that I have received from members of the DEA, Amarillo Police Department (APD), and other law enforcement agencies;

c.  discussions I have had personally concerning this investigation with federal and state investigators who are experienced in investigating criminal organizations involved in drug trafficking;

d.  physical surveillance conducted by DEA and APD, the results of which have been reported to me either directly or indirectly;

e.  public records;

f.  telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g.  statements of confidential sources;

h.  controlled purchases of heroin; and

i.  Your Affiant believes that the statements and actions of the confidential source discussed below is credible based on the fact that the sources' actions have either

2

been monitored by law enforcement or those sources have produced results in the past that have been corroborated by independent investigation.

### Purpose of this Affidavit

3.      The information contained in this Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of a search warrant for the subject premises.  As shown in the following paragraphs, this location is being used in furtherance of a sophisticated and long-running scheme to traffic in controlled substances.  There is probable cause to believe that evidence and instrumentalities of the offenses described herein continue to be located at the subject premise. The warrants are also being sought to discover evidence pertaining to: (1) conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; and (2) distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

### Premises to be Searched

4.      I declare that the facts contained in this Affidavit show that there is probable cause to search the following premises:

a.      719 N. Wilson St. Amarillo, Potter County, Texas, 79107 (controlled by Jeff LOPEZ);

b.      1536 SE 7TH St. Amarillo, Potter County, Texas, 79107 (controlled by John Lopez).

3

**Background Information Regard Drug Trafficking Conspiracies**

5.    Based upon my training, experience, and participation in other narcotics investigations and my extensive discussions with experienced agents of the DEA and APD, I know that people who deal in illegal controlled substances share various combinations of common characteristics, which are listed as follows:

a.    Significant narcotics traffickers and distributors of controlled substances, such as methamphetamine, frequently maintain on hand large amounts of U.S. currency in order to maintain and finance their narcotics business;

b.    Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances; furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles; I know narcotic traffickers will often maintain the aforementioned books, records, receipts, notes, ledgers, etc.

c.    It is common for significant dealers to secrete contraband, including controlled substances (heroin), in secure locations within their residences, businesses, and automobiles for ready access and to conceal the same from law enforcement authorities;

d.    Persons involved in significant drug trafficking conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and

4

evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities;

e.      When drug traffickers amass proceeds from the sale of drugs, the drug traffickers often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers.   To accomplish these goals, drug traffickers often use different techniques, including, but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds;

f.      Narcotics traffickers commonly maintain books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

g.      Narcotics traffickers take, or cause to be taken, photographs of them, their associates, their property, and their product.   These traffickers usually maintain these photographs in their possession;

h.      Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and these paraphernalia include, but are not limited to, scales, plastic bags, cutting agents, and other devices used for packaging, to aid in the concealment of the drug for its distribution;

i.      The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances;

5

j.      Dealers in narcotics often keep firearms, ammunition, and other weapons in their residences, businesses, and automobiles to safeguard supplies of drugs and the fruits of narcotics dealings;

k.      Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names and that they maintain such documents in evidence of their false identities in their residences, businesses, and automobiles together with evidence of their true identities;

l.      Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and frequently conducting their business during the nighttime hours when darkness helps conceal their activities;

m.      Major drug traffickers commonly conduct a significant amount of their business by using cellular telephones and normally make frequent calls to direct, supervise, and coordinate their activities;

n.      It is highly unusual for individuals primarily engaged in drug trafficking activities to associate in their businesses or social activities with others not engaged in the same drug trafficking activities;

o.      Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences, businesses, and automobiles;

p.      Drug traffickers maintain records using the assistance of computers and other

6

electronic data storage/processing devices. These computers commonly include computer hardware, computer software, computer related documentation, and computer data security devices.   Moreover, based upon your Affiant's knowledge, training, and experience, your Affiant knows that searching and seizing information from computers and other electronic data storage/processing devices often requires agents to seize most or all electronic storage devices (along with related peripherals), which commonly includes handheld computers, electronic organizers, compact discs, digital video discs, smart media cards, jump drives, zip discs and floppy discs, to be searched later by a qualified computer expert in a laboratory or other controlled environment.   This is true because the great volume of information which can be stored on computers can take weeks and evens months to sort, and it would be impractical to attempt this type of data search on site.   Moreover, searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment;

q.    Further, I know that drug traffickers often maintain many of the aforementioned items for long periods of time.   For example, drug traffickers will often maintain records associated with their narcotics trafficking for several months, or even years, because they need these records to efficiently operate and organize their drug trafficking operation. As another example, drug traffickers often maintain paraphernalia for packaging, cutting, weighing, and distributing narcotics for long periods of time because narcotics traffickers prefer not to incur the expense of replacing these items on a frequent basis and, further, some narcotics traffickers erroneously believe that such items are not incriminating.   In a

7

final example, narcotics traffickers often keep firearms, ammunition, and other weapons for a long period of time because, likewise, they prefer not to incur the expense of replacing these items on a frequent basis and, further, some narcotics traffickers erroneously believe that such items are not incriminating. Accordingly, while some items (such as narcotics) remain at a narcotics trafficker's residence for a short period of time, many of the items needed to operate a narcotics trafficking conspiracy are maintained at a residence for several months and even years.

### Facts in Support of Probable Cause

6. In this application and affidavit, I ask permission to search the above-listed locations in order to further uncover the scope of the drug Trafficking conducted by Jeffrey LOPEZ and to gather evidence to be used to prosecute the LOPEZ and other unidentified co-conspirators, as well as to enable investigators to identify assets purchased with drug proceeds and the methods through which LOPEZ and others are laundering their drug proceeds.

7. During the course of this investigation, LOPEZ has been identified as a source of supply of methamphetamine. LOPEZ was identified during a previous controlled purchase conducted on September 2, 2020 from Mark HEFLEY utilizing a Confidential Informant (CI).

8. During the controlled purchase the CI was directed by Hefley to pull the CI's vehicle around the back of Hefley's residence. The CI believed Hefley asked the CI to pull the vehicle around the back of Hefley's residence because Hefley's

8

methamphetamine source of supply would be arriving soon.    Soon after the CI was directed to the rear of Hefley's residence physical surveillance observed Hefley leave his residence driving a gold colored SUV. Hefley drove to the parking lot of the Super Mercado Los Olivos market located at 3803 N.E. 24th Avenue, Amarillo, Texas located just to the east of Hefley's residence. DEA Special Agent Chris Brown observed Hefley exit Hefley's vehicle and enter a black in color 2020 Nissan Altima that was displaying Texas temporary registration 84386D7.    Hefley met with the unknown individual in the Nissan Altima for approximately two minutes before physical surveillance observed Hefley leaving the parking lot of the Super Mercado Los Olivos and return back to Hefley's residence. TFO Hoffman from training and experience knows it is common for narcotics transactions to occur in parking lots and occur in a short amount of time. This is consistent with Hefley's actions when meeting with the occupant of the black Nissan. Physical surveillance was conducted by investigators on the Nissan Altima as it left the area of the meeting with Hefley. Physical surveillance that included DEA SA Key Sayasone followed the Nissan Altima and observed the Nissan Altima parked in the driveway of 1536 S.E. 7th Avenue, Amarillo, Texas. DEA TFO Vern Wilson observed a Hispanic male exit the Nissan Altima after parking. DEA TFO Wilson estimated the Hispanic male was in his late forties to early fifties. DEA TFO Mincher conducted a registration check and found the Nissan Altima was registered to John Lopez at the residence located at 1536 S.E. 7th Avenue, Amarillo, Texas.

9

9.     Once Hefley arrived back to Hefley's residence Hefley once again met with the CI, this time in a bedroom of Hefley's residence. Hefley provided the CI with a sandwich sized zip top baggie that contained an off white crystalline substance weighing approximately two (2) ounces in exchange for $1,200 of U.S. currency provided to the CI by investigators.   The off white crystalline substance later field tested positive for the presence of methamphetamine. TFO Mincher was able to observe audio and video from the equipment provided to the CI. TFO Mincher observed Hefley on the video removing the suspected methamphetamine provided to the CI from a larger clear plastic bag of suspected methamphetamine. The CI left the area and met back with investigators. Based on the physical surveillance and conversations with the CI, TFO Mincher believes the driver of the Nissan Altima delivered the suspected methamphetamine to Hefley that Hefley in turn supplied to the CI. It was unknown at the time who was driving the Altima.

10.     TFO Mincher wrote a search warrant for the location data for the phone number (626-723-8804) identified as the source of supply from the controlled purchase from Hefley. The location showed a location within 5 meters of 719 N Wilson. TFO Mincher went to this residence and located the same black Altima that met Hefley during the controlled purchase sitting in the driveway of 719 N Wilson. A search of city utilities for 719 N Wilson was done and found that the utilities were in the name of Jeffrey Rene LOPEZ.

11.     On October 21, 2020, a controlled purchase was conducted utilizing a Confidential Source (CS). Agents from the Amarillo DEA Resident Office and Amarillo Police Department met with the CS who identified Jeffrey LOPEZ as a methamphetamine dealer in Amarillo, TX. The CS was provided funds to purchase 2 ounces of methamphetamine from LOPEZ. Surveillance was established prior to the CS arriving at the residence at 719 N Wilson, Amarillo, Texas identified as LOPEZ's residence. The CS arrived at approximately 3:47 p.m. to the residence of LOPEZ. The CS was provided one ounce of methamphetamine at the residence from LOPEZ in a bedroom. Agents heard on a recording device LOPEZ stated he doesn't keep it all here, referring to the methamphetamine, and would meet the CS after he went to another location on 7th to get some more methamphetamine. Agents had previously identified 1536 SE 7th as the residence of LOPEZ' brother. Surveillance was established at 1536 SE 7th at 4:13 p.m.

12.     LOPEZ left his residence at 4:16 p.m. in his black Altima. LOPEZ arrived and parked across the street from 1536 SE 7th and walked to the residence at 4:23 p.m. At 4:40 p.m. LOPEZ walked outside and went to the Altima and left the area. Several calls were made between LOPEZ and the CS. A meet location of a laundromat on Wichita was set to receive the second ounce.

13.     The CS arrived at the laundromat located at 1314 Wichita at 5:00 p.m. LOPEZ handed the CS a towel. Inside the towel was an additional ounce of methamphetamine. The CS left the laundromat at 5:06 p.m.

11

14.     The two ounces were released to the affiant. The total weight was 59.4 gross grams. The two ounces were field tested and tested positive for the presence of methamphetamine. During a debrief, the CS stated LOPEZ had a bag of approximately 2 to 3 ounces in the residence at 719 Wilson. LOPEZ supplied the first ounce from that bag. LOPEZ also had several firearms inside the residence.

15.     The address of 1536 SE 7th according to Potter Randall Appraisal District, PRAD, is owned by a John Lopez, who is the brother of LOPEZ. The black Altima driven by LOPEZ during a previous controlled purchase was followed by Agents to the address of 1536 SE 7th.

## Conclusion

Your Affiant submits that based upon the above facts, there is probable cause to believe that Jeffrey LOPEZ has committed the offense of Conspiracy to Distribute and to Possess with the Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846. I further believe that there is probable cause to believe that evidence, contraband, fruits of crime, items illegally possessed, and property designed for use, intended for use, and used in committing this crime (as itemized in Attachment B to the Application for Search Warrant) will be found on the premises of:

1.   719 N Wilson Street, Texas

2.   1536 SE 7th Street, Texas

12

Accordingly, I respectfully ask for a warrant to search these premises under Rule

41 of the Federal Rules of Criminal Procedure.

Jeremy Hoffman
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim.

P. 4.1 by telephone.

Lee Ann Reno
UNITED STATES MAGISTRATE JUDGE

13

**ATTACHMENT "A"**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

House Description- 1536 SE 7th Amarillo, TX Potter County, Texas

1536 SE 7th Amarillo, Potter County, Texas is described as a single family residence. The residence is a 748 square feet, single level home. The residence is located on the south side of SE 7th St. and approximately three residences west of the intersection of S Williams and SE 7th.

Said suspected place, in addition to the foregoing description, includes all other buildings, structures, storage units, vehicles and places on said premises, or within the curtilage of said residence, 1536 SE 7th Amarillo, Potter County, Texas,



**ATTACHMENT "B"**
**LIST OF ITEMS TO BE SEARCH FOR AND SEIZED**

**Property to be Searched and Seized**

(1) Records and information pertaining to violations of 21 U.S.C. §§ 841(a)(1), 843(b), 844, and 846

(2) Books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the transportation, importation, ordering, sale, and distribution of illegal controlled substances including, but not limited to, Cocaine.

(3) Vehicle described as a black in color 2020 Nissan Altima that was displaying Texas temporary registration 84386D7

(4) Currency, financial instruments, precious metals, jewelry, vehicle registration receipts, property titles, and other items of value and/or proceeds of drug transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal controlled substances;

(5) Books, records, receipts, notes, airline tickets, and other records evidencing significant cash expenditures, such as aircraft, boats, vehicles, and other items of value that are the proceeds of illegal drug transactions, and further showing the concealment of the source and ownership of such cash, proceeds, and items of value by use of false names, postal box addresses,

addresses of relatives and acquaintances, sham corporations, and other such devices;

(6) Telephone and address books or papers that reflect names, addresses, and/or telephone numbers for their associates in dealing in illegal controlled substances and persons or entities from whom proceeds of drug transactions or other items of value have been obtained and in what manner said proceeds are presently maintained;

(7) Photographs, negatives, videotapes, films, undeveloped film, slides, and other media-containing material of individual, conspirators, property, firearms, assets purchased with drug proceeds, United States currency, and illegal controlled substances;

(8) Books, records, receipts, notes, identification documents, and other papers indicating that the persons associated with the organization described within this affidavit are presently using aliases or assumed names other than their names and are representing themselves to others under these assumed or alias names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities;

(9) Paraphernalia for using, packaging, processing, diluting, weighing, and distributing controlled substances including, but not limited to: scales, plastic bags, and heat-sealing devices;

(10)    Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

(11)     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

(12)     Cash, currency, and records relating to income and expenditures of money and wealth concerning controlled substances, including but not limited to: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, and cash registers;

(13)     Items of personal property that tend to identify the person(s) in residency, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

(14)     Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel, motel, and rent-a-car statements, correspondence with travel agencies and other travel-related businesses, airline, rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, and other papers relating to domestic and international travel, relating to the distribution of controlled substances illegally;

(15)     Metal or cardboard cans or any other object that is modified or is capable of being modified to conceal contraband within, as well as money belts, or other devices used to conceal contraband and drug proceeds;

(16)     Any and all U.S. Mail, parcel packaging and wrappings, shipping information, tracking numbers, account information for any and all package service agencies or businesses to include United States Postal Service, United Parcel Service, Federal Express, and other package services;

(17)     All firearms as that term is defined by Title 18, United States Code, Section 921(a)(3), magazines, firearm accessories, ammunition, and any other firearms related items, which are used or possessed in relation to illegal drug trafficking.

(18)     Counter-surveillance equipment including, but not limited to, video surveillance devices, night vision equipment, electronic listening devices, motion sensors, alarms, and communication devices; and

(19)     Any and all cryptocurrency, to include the following:

   a. any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

   b. any and all representations of cryptocurrency private keys, whether in electronic or physical format;

   c. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

(20) Computers or storage media used as a means to commit violations of 21 U.S.C. §§ 841(a)(1), 843(b), 844, and 846

(21) For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

(22)    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes the opening of locked containers, by force if necessary, at the Subject Premises or at an appropriate law enforcement facility or other controlled environment, if it is not practical or safe to open the locked containers at the Subject Premises during the search. "Locked containers" include, but are not limited to, any and all locked rooms, cabinets, files, drawers, closets, safes, and vehicles.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to press the fingers, including thumbs, or present the irises or faces of Jeffrey LOPEZ, to the appropriate biometric sensor on locked drives for the purpose of attempting to unlock the device via a biometric authentication feature in order to search the contents as authorized by this warrant.